# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| LAURA ANN COLLIER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NANCY BERRYHILL,[1] ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) | NO. 3:14-cv-01450 <br> CHIEF JUDGE CRENSHAW |

## MEMORANDUM OPINION

Pending before the Court is Laura Ann Collier's Motion for Judgment on the Administrative Record ("Motion") (Doc. No. 14), filed with a Memorandum in Support (Doc. No. 14-1). The Commissioner of Social Security ("Commissioner") filed a Response in Opposition to Plaintiff's Motion (Doc. No. 17), to which Plaintiff replied (Doc. No. 18). On July 24, 2014, this case was referred to a Magistrate Judge. (Doc. No. 3.) The Court hereby withdraws that referral. In addition, upon consideration of the parties' filings and the transcript of the administrative record (Doc. No. 10),[2] and for the reasons stated herein, the Court denies Plaintiff's Motion (Doc. No. 14).

### I. Introduction

Collier filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") under Title XVI of the Act on June 14, 2011, alleging a disability onset of June 1, 2008. (Tr. 11.) Collier's claim was denied

---

[1] Nancy Berryhill became Acting Commissioner for the Social Security Administration on January 23, 2017.

[2] Referenced hereinafter by page number(s) following the abbreviation "Tr."

at the initial and reconsideration stages of state agency review. (Tr. 56, 62.) Collier subsequently requested *de novo* review of this case by an Administrative Law Judge ("ALJ"). The ALJ heard the case on March 22, 2013, when Collier appeared with counsel and gave testimony. (Tr. 36–51.) Testimony was also received from an impartial vocational expert. At the conclusion of the hearing, the matter was taken under advisement until April 26, 2013, when the ALJ issued a written decision finding Collier not disabled. (Tr. 8–23.) That decision contains the following enumerated findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since June 1, 2008, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairment: bipolar disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, … the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she could understand, remember, and carry out simple instructions, could perform routine tasks on a sustained basis with minimal to normal supervision, could work with co-workers, but would work better with minimal social interaction and with non-confrontational supervisors, and could adjust to infrequent changes at work.

6. The claimant is unable to perform past relevant work.

7. The claimant is a younger individual (20 C.F.R. 404.1563 and 416.963).

8. The claimant has at least a high school education and attended two years of college (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skill is not an issue because of the claimant's young age.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that

the claimant can perform (20 C.F.R. 404.1596, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2008, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

12. The claimant's subjective complaints have been evaluated as required under the applicable regulations and rulings.

(Tr. 13–14, 17–18.)

On May 16, 2014, the Appeals Council denied Collier's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g).

## II. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

> The claimant has a long history of mental health treatment, with psychiatric hospitalizations in 2001, when she threatened to kill herself and her boss. However, Mental Health Cooperative treatment notes from the pertinent period show a generally stable condition when she was compliant with medications. Although she had psychiatric hospitalizations in 2001, she improved such that she returned to work at Kroger from 2005 to 2007, earning over $13,000 from that employer in 2006. Exhibit 5D. Treatment notes from 2008 to 2009 show that she was steadily looking for employment. In June 2008, she had been off her medication for six weeks, with increased symptoms. She ran out of medications again (and did not notify her case manager until after she had run out) in September 2008, December 2008, July 2009, and September 2009. Medication maintenance notes were routine, and she typically did not report any psychological symptoms. She missed many case management visits. She was frequently babysitting for her grandchild in 2009. She did not have any visits in January 2010, when her sister died. Her case manager advised her that she should see her therapist, but she did not report seeking therapy until July 2010. By September 2010, she was working at a restaurant, and continued to do so through the remainder of the year, but stated that she was not getting enough hours and was looking for other work. The only documented visit with the staff psychiatrist, Dr. Drummond, occurred in March 2011, at which

time he reported that the claimant was doing well, had no mood symptoms, and no side effects to medication. She reported difficulty getting the co-payment for her medication, so the case manager took her medications for a week at a time in April 2011. She reported no symptoms other than some difficulty with sleeping in June 2011. Exhibit 2F. She told the nurse practitioner that the medications were not effective in September 2011, and she reported hallucinations telling her to hurt people. Her medication dosage was increased. She ran out of medication in December 2011 and January 2012. However, in between those dates, she reported her mood was better and she denied depression, irritability, and any hallucinations. She was seen for a routine medication maintenance visit in March 2012, and reported improvement in hallucinations. She did not keep a June 2012 appointment, but was seen again in July 2012, reporting that medications were effective. Meanwhile, her case manager had taken her to renew her food stamp certification, taken her to the Board of Education to get her school records so that she could enroll in college to study early childhood development, had provided her with bus passes for transportation, food boxes, utility assistance, clothes for her children, section eight assistance, and other housing assistance. Her medications were changed in August 2012 after she reported they were not working. When next seen for medication maintenance in September 2012, she had been off medications for two or three weeks, because she said that Depakote caused itching. Her psychiatric symptoms also increased because she was off medication. She stopped taking medication again in October 2012, because she thought that the new medication caused itching, and was switched to Seroquel. Better adherence to her medication regimen was noted in November 2012. She again stopped taking her medication in December 2012 because her hair was falling out. However, she was reassured that her medication would not cause such a side effect. By later that month, she reported no psychiatric symptoms and no side effects to medication. Her case manager reported that she was in a happy mood and had no symptoms. Her last documented visit from the case manager occurred in January 2013, when she said she was happy except her estranged husband kept coming around, and she wanted a restraining order. She reported she was getting monthly social security checks. Her house was neat, even though she shared it with five children. She again reported that she wanted to get a job. Exhibit 11F. GAF values during the relevant period were 65, indicative of mild symptoms, except in January 2010, after the death of her sister, when the GAF was temporarily reduced to 45. GAF values represent a snapshot of functioning at

4

the time they are reached, but do not generally have long term significance. However, given that her GAF remained virtually the same from 2008 to 2010, one could infer that she had no more than mild symptoms persistently during that period. Exhibit 2F.

The claimant's long time therapist, Ms. Simmons, a licensed clinical social worker, sent two brief notes stating that she had treated the claimant since December 2000, but that the claimant had had no hospitalizations since 2001. She stated that the frequency of visits fluctuated depending on the needs of the claimant. Unlike at Mental Health Cooperative, which gave a diagnosis of bipolar disorder, Ms. Simmons reported a diagnosis of major depressive disorder with recurrent psychotic features. Ms. Simmons reported that the claimant frequently said that she wanted to work, but her employment history was sporadic due to her mental health difficulties. Ms. Simmons did not feel the claimant could obtain and keep a job in January 2013 and stated that she did not feel the claimant could maintain steady and consistent employment in March 2013. Ms. Simmons refused to release her treatment notes. Exhibit 10F and 12F. No weight can be assigned these statements, because there are no treatment notes, and no information has been provided concerning the frequency of visits with Ms. Simmons. From the information gleaned from the Mental Health Cooperative treatment records, the claimant's visits to her "therapist" were quite rare during the period in question. In June 2009, the claimant told her nurse practitioner that she had seen her therapist six months before. In September 2009, she reported last seeing her two months before. After her sister died in January 2010, her case manager suggested she see a therapist, but she did not report seeing the therapist again until July 2010. Exhibit 2F. There was no further mention of seeing the therapist again until she told her case manager in September 2012 that she did not meet with the therapist on a regular schedule, only when she needed to talk to the therapist about current issues. Exhibit 11F. Thus, there has been little evidence provided to show that Ms. Simmons treated the claimant on a regular basis. She gave no specific limitations of function. A social worker is not considered to be a medically acceptable source under the regulations.

She underwent a consultative psychological evaluation conducted by Dr. Lambert in September 2011, remarkable for a finding of malingering. Dr. Lambert reported that the claimant may not have been a very accurate historian, as she appeared to be malingering during the mental status evaluation. She denied any family history of substance abuse, but Mental Health Cooperative records

5

> provided to Dr. Lambert clearly indicated substance abuse in her sister and aunt. She rocked back and forth in the waiting room and during the interview (although that behavior was never reported in any Mental Health Cooperative treatment record). Concentration during the mental status evaluation was poor, but the claimant did not appear to be putting forth her best effort. Although she knew the names of past Presidents, she misidentified the shape of a basketball as oval, even though she had played the game in the past. She could not count backwards from 10 to 1. She could not spell "world" forward or backward. She said that she could not recall any of three objects. She was articulate, alert, but not very cooperative. Affect and mood appeared anxious. She denied current suicidal or homicidal ideation. She reported occasional auditory and visual hallucinations, but said that they were better with medication. Abstraction appeared impaired. She complained of feeling depressed and sad, worrying, sleep difficulty, mood swings, irritability, difficulty concentrating and memory problems, and anxiety, but said that medication helped her symptoms. She also reported symptoms of a borderline personality disorder. She had been separated from her husband for the previous four months, and had five children living with her. She had a driver's license, but did not drive because she did not have a vehicle. She cleaned house and cooked full meals. She watched television, and occasionally went to movies with friends. She got her children ready for school daily and walked regularly. She reported three to four good days a week. Dr. Lambert diagnosed malingering, with bipolar disorder and personality disorder to be ruled out. She was unable to assess the claimant's ability to understand and remember, socially interact, or adapt because of malingering. Dr. Lambert did end her report with the notation that the claimant was able to run a household and care for her many children. Exhibit 4F.

(Tr. 14–16.)

Additionally, Collier was evaluated by Dr. Anne-Marie Bercik, a non-examining state agency medical consultant, on October 3, 2011. In the Mental Residual Functional Capacity Assessment ("Assessment"), Dr. Bercik found that Collier was moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek and perform at a consistent pace; to accept instructions and respond appropriately to criticism from supervisors;

to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 740–41.) Overall, Dr. Bercik found that Collier "is capable of completing simple tasks on a regular basis from a mental standpoint" and that she "can understand, retain, and carry out simple instructions[,] … can consistently and usually perform routine tasks on a sustained basis, with minimal (normal) supervision, and can cooperate effectively with public and coworkers in completing simple tasks and transactions." (Tr. 742.) Dr. Bercik also completed a Psychiatric Review Technique form ("PRTF"). (Tr. 744–756.) The Assessment and PRTF were affirmed as written by Dr. Jeffrey Wright on November 23, 2011. (Tr. 759.)

## III. Conclusions of Law

### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Buxton v. Halter, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." Brooks v. Comm'r of Soc. Sec., 531 F. App'x 636, 641 (6th Cir. 2013) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. See Hernandez v. Comm'r of Soc.

Sec., 644 F. App'x 468, 473 (6th Cir. 2016) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this Court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (quoting Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." Miller, 811 F.3d at 833 (quoting Gentry v. Comm'r of Soc. Sec., 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to

> Subpart B of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4. A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Parks v. Soc. Sec. Admin., 413 F. App'x 856, 862 (6th Cir. 2011) (citing Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity[.]" Kepke v. Comm'r of Soc. Sec., 636 F. App'x 625, 628 (6th Cir. 2016) (quoting Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. See Anderson v. Comm'r of Soc. Sec., 406 F. App'x 32, 35 (6th Cir. 2010); Wright v. Massanari, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. Wright, 321 F.3d at 615–16; see Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert ("VE")

testimony.  Anderson, 406 F. App'x at 35; see Wright, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Glenn v. Comm'r of Soc. Sec., 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C.  Plaintiff's Statement of Error

Collier's only argument is that the ALJ failed to adequately portray her limitations in the RFC and the hypotheticals posed to the VE.  Therefore, Collier concludes, the ALJ's finding that she can successfully transition to other work available in sufficient numbers in the national and regional economy lack substantial evidence.  (Doc. No. 14-1 at 1.)

First, the RFC is an administrative finding made by the ALJ based upon all of the evidence of record and is an assessment of the claimant's remaining capacity for work once the claimant's limitations have been taken into account.  See 20 C.F.R. §§ 404.1527, 416.927, 416.945; SSR 96-6p.  In forming this assessment, the ALJ may consider the opinions of state agency physicians and has the authority to determine which medical findings to credit and which to reject.  See Justice v. Comm'r of Soc. Sec., 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject.  Contrary to Justice's contention, the ALJ had the authority to make these determinations.").

Here, Collier seems to propose that the ALJ said she had adopted Dr. Bercik's opinion in its entirety in formulating the RFC (Doc. No. 14-1 at 5; Doc. No. 18 at 1); however, the ALJ

stated that her RFC finding was "*generally* based on the opinion of … Dr. Bercik" (Tr. 17 (emphasis added)). Notably, Dr. Bercik's ultimate opinion was that Collier is able to work. (Tr. 742.) The ALJ also stated that the limitations contained in the RFC were consistent with the narrative in Dr. Lambert's opinion[3] as well as the reported activities in the case management reports and medication management reports from the Mental Health Cooperative. (Tr. 17.) Furthermore, although the ALJ concluded that Collier's bipolar disorder constituted a "severe impairment," she also found that Collier's subjective complaints were not entirely credible, stating that:

> The medical evidence submitted from the Mental Health Cooperative shows the claimant's psychological symptoms to be minimal when she is compliant with medication. She frequently missed case management visits, and appeared to use her case worker as a personal attendant to retrieve medications, bus passes, payment for utility bills, food boxes, clothes for her children, and transportation whenever needed. There was no evidence of social impairment related to her activities during the period in question. GAF scores, though of limited value, were consistently in the mild range (with one exception). She was fully able to run a household containing five sons, care for a grandchild, and planned to go to college to get a degree in early childhood development. Treatment records showed exacerbation of her symptoms when she was non-compliant with medications on several occasions. Dr. Lambert was unable to assess the claimant's ability to work because of perceived malingering. Ms. Simmons' statements were so vague as to be rendered useless, and she refused to submit her treatment notes. The claimant's subjective complaints are not persuasive.

(Tr. 18–19.) The ALJ properly considered and evaluated the objective medical evidence of record as well as Collier's subjective complaints in her assessment. The Court finds that the ALJ's formulation of the RFC included all of the limitations which she properly found to be credible and is supported by substantial evidence.

---

[3] Dr. Lambert diagnosed Collier's primary impairment as "malingering" and stated that, because of this, she was unable to assess Collier's ability to work. (Tr. 742.)

11

Second, regarding the hypotheticals, "[a]n ALJ may rely on a vocational expert's response to a hypothetical question if that question was based on limitations that were properly credited by the ALJ and supported by substantial evidence in the record." Keeton v. Comm'r of Soc. Sec., 583 F. App'x 515, 532 (6th Cir. 2014) (citations omitted). In order for the testimony of a VE to constitute substantial evidence that a significant number of jobs exist in the economy, "the question[s] must accurately portray a claimant's physical and mental impairments." Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 516 (6th Cir. 2010). "[T]he ALJ is only required to incorporate into the hypothetical questions those limitations that have been accepted as credible," McIlroy v. Comm'r of Soc. Sec., 42 F. App'x 738, 739 (6th Cir. 2002) (citation omitted), and "is not obligated to include unsubstantiated complaints and restrictions in [her] hypothetical questions," Brewer v. Soc. Sec. Admin., 39 F. App'x 252, 254 (6th Cir. 2002).

In the case at hand, the ALJ posed two hypothetical questions to the VE. First, she asked whether there was work available for a person

> of the claimant's age, education, and work experience who has no physical limitations and the mental limitations … where she can understand, retain, and carry out simple instructions. She can consistently and usefully perform routine tasks on a sustained basis with minimal or normal supervision. She can cooperate effectively with the public and coworkers in completing simple tasks and transactions. However, she would do better in an environment with minimal social interactions and she would benefit with working with a non-confrontational supervisor. She would find it difficult to adapt appropriately to changes in the work environment so she would do better with infrequent changes.

(Tr. 49.) The VE responded that there was, and listed several specific jobs and the number of openings for those jobs in the national and regional economy. (Tr. 49–50.) For the second hypothetical, the ALJ asked whether there was work for a person with the same limitations as the first hypothetical, plus an inability to interact with others, including supervisors, and an inability

12

to react appropriately to work related stress. (Tr. 50.) The VE answered that there was not. (Tr. 50.) The ALJ's determination of Collier's RFC is, in substance, the same as the first hypothetical question. Next, Collier's attorney asked the VE what would happen if, in addition to the limitations presented in the first hypothetical, Collier was unable to sustain concentration, pace, or persistence "for only one hour at a time". (Tr. 50.) The VE responded that the claimant would be unable to maintain competitive employment. (Tr. 50.)[4]

Collier asserts that the ALJ's hypothetical questions were insufficient to meet the requisite standard because the ALJ did not include limitations on her ability to maintain concentration, persistence, and pace, "despite the fact that Dr. Bercik clearly found such limitations." (Doc. No. 14-1 at 6.) As stated above, the ALJ did not wholesale adopt Dr. Bercik's opinion and was not bound to do so. Rather, the hypothetical questions posed to the VE were properly based on the limitations that the ALJ did find to be credible. These limitations were based on the objective evidence in the medical record, including portions of Dr. Bercik's findings, which were consistent with the narrative of Dr. Lambert and the reports from the Mental Health Cooperative. The ALJ was not required to incorporate unsubstantiated restrictions, such as the subjective complaints made by Collier that the ALJ thoroughly explained were discredited, as discussed above. See Brewer, 39 F. App'x at 254. Thus, the ALJ's hypothetical questions and RFC properly reflected Collier's limitations that she found to be credible.

---

[4] Collier notes that "in response to questioning by Collier's counsel, the VE testified that either limitation advanced by Dr. Bercik would preclude work." (Doc. No. 14-1 at n.3, p. 6.) This is not well received because it deliberately misconstrues counsel's question, which did not reflect the actual limitations found by Dr. Bercik. Despite finding moderate difficulties in "maintaining concentration for *extended* periods of time," Dr. Bercik ultimately found that Collier "can consistently and usually perform routine tasks on a *sustained* basis." (Tr. 742 (emphasis added).) Dr. Bercik made no mention of Collier only being able to sustain concentration for merely an hour at a time.

The Court finds that the ALJ properly considered the evidence of credible limitations from Collier's mental impairments and propounded hypothetical questions to the VE that took account of such credible limitations. Therefore, the ALJ was entitled to rely on the VE's testimony to the existence of jobs in the economy that would accommodate those limitations. The resulting decision that Collier is not disabled is thus supported by substantial evidence and will be affirmed.

## IV. Conclusion

For the reasons stated herein, Plaintiff's Motion for Judgment on the Record (Doc. No. 14) will be denied and the decision of the Social Security Administration will be affirmed. An Order will be filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE